## Louisville & N. R. Co. v. Jones' Adm'r

May 16, 1944.

H. T. Lively and Tye & Siler for appellant.

R. L. Pope, C. B. Upton and J. C. Bird for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

About 1 p. m. on Saturday, November 21, 1942, Mrs. Armelda Jones was struck and killed by a southbound freight train of the Louisville & Nashville Railroad Company while attempting to cross the railroad company's main track in the unincorporated village of Saxton, Whitley county, Kentucky. Mrs. Jones was 87 years of age. Joe L. Jones, son of the decedent, qualified as administrator of her estate, and instituted an action in the Whitley circuit court to recover damages for her death. The jury returned a verdict for $2,000 in favor of the plaintiff, and from the judgment entered thereon this appeal is prosecuted.

There are three tracks at Saxton, the main track, a passing track and a switching track. The point at which

the accident occurred is on a path or walkway across the railroad tracks, and the principal issue in the case was whether there had been such habitual use by the public of the tracks at that place with the knowledge and acquiescence of the company as to impose upon it the duty of maintaining a lookout, sounding a warning of the approach of trains, and using all appropriate means to avoid injuring persons upon the track where the path in question crossed. It is appellant's contention that the evidence failed to show such use of the path by the public as would convert the decedent from a trespasser into a licensee, and that the court erred in overruling its motion for a directed verdict in its favor. It is conceded that no warning signals for the crossing were given, and that none of the train crew saw the decedent until after she had been struck. If the decedent was a trespasser, the appellant, of course, owed her no duty until her peril was discovered. For many years the railroad company maintained a depot at Saxton with a ticket agent and telegraph operator, but the depot was abandoned and the building removed ten or twelve years before the accident and thereafter what is referred to in the record as a station shed was maintained for the use of the traveling public. The accident occurred within a few feet of this shed. Mrs. Jones lived west of the railroad tracks and about 150 feet from the station shed. There were four other dwellings near the Jones home west of the tracks. East of the railroad tracks and within a few hundred feet were two stores, a post office, and eight or ten dwellings. A well-defined path led to the stores and post office from a point directly across the railroad tracks from the station shed. U. S. highway 25 passes under the railroad through an underpass at a point about 200 feet north of the station shed, and a gravel road, which intersects highway 25 near the underpass, runs south toward Jellico, Tennessee, passing between the station shed and Mrs. Jones' home. The plaintiff introduced evidence to the effect that the occupants of the five houses at Saxton west of the station shed, others living along the gravel road south of Saxton, and many persons living in the country west of the village used the path across the tracks near the station shed when going to and from the stores and post office located on the east side of the tracks, a number of them making many trips a day. Persons living east of the tracks also used the path going to and from

the station shed and a grist mill located on the west side of the tracks. Several witnesses living in the neighborhood gave estimates of the number of pedestrains crossing the tracks daily at the point where Mrs. Jones was struck. Some of them estimated the average number at 125 to 150. Manuel Jones, son of the decedent, estimated the number at 150 or 200 "on an ordinary day." Joe Jones, another son, estimated the number at 300 or 400. On one occasion he counted the number of pedestrians using the crossing during a 15 minute period, and 9 crossed from the east to the west side of the tracks and about half of them returned. Mrs. J. H. Bowman lived near the station shed. There were seven members of her family, and they used the crossing twelve or fifteen times daily. When asked how often she saw people cross the tracks at the point in question, she said: "Well, of course, I don't watch the railroad, I generally have something to do but I never turn my head but what some one is going or coming." Charlie Jones, who lived on the west side of the tracks and who was not related to the decedent, in answer to a similar question, said: "Every time you noticed to look out there would be some one practically all the time passing there." At another point he said: "Most any time you look that way there would be somebody crossing and sometimes five or six." Estil Brummit, who lived at Saxton, estimated the number of persons using the walkway daily at 200. Bill Thompson testified that he had seen as many as 12 cross at one time. On the use of the tracks by the public, the defendant introduced Albert Moore, who made a check of the number of people who crossed appellant's tracks at the point of the accident from 7 a. m. to 7 p. m., Saturday, March 13, 1943. This check showed 83 people going directly across the tracks at the walkway and 7 using the tracks longitudinally from north to south, or a total of 90. Between 12 noon and 1 p. m. 9 people used the pathway. It was shown that the path or walkway had been used more than 30 years, and that the railroad company had constructed steps over the fence along the east side of the right of way at the point where the path crossed. Later a gate was substituted for the steps. The railroad company also constructed a bridge across the ditch on its right of way east of its tracks for the use of pedestrians. The bridge consisted of three railroad ties laid at right angles to the tracks.

We have had before us in numerous cases the question whether a person who is injured while using a railroad track is a trespasser or a licensee. The determination of the question is dependent upon the extent of the use and the nature of the surrounding territory; that is, whether it is a thickly populated community or a sparsley settled region. We have held that the use of a railroad track at a particular point by fewer than 150 persons daily will not constitute the users licensees to whom the operators of trains owe a lookout duty and the exercise of other precautionary measures for their safety. Louisville & N. R. Co. v. Bush's Adm'x, 285 Ky. 645, 146 S. W. 2d 2050; Louisville & N. R. Co. v. Jackson, 286 Ky. 595, 151 S. W. 2d 386. The evidence as to the number of pedestrians who crossed appellant's tracks daily at the station shed is not entirely satisfactory. It consists mostly of estimates or guesses by various witnesses, but there is some evidence that the tracks at this point had been used habitually for more than 30 years by a considerable number of persons. In addition it is shown that the railroad company constructed and for a long period of time had maintained a bridge across a ditch on its right of way at the point where it is crossed by the walkway. It also constructed and maintained steps over the fence along the east side of its right of way, and later cut the fence and installed a gate. The facts are similar to those in Louisville, H. & St. L. R. Co. v. Lyons, 146 Ky. 603, 143 S. W. 31, 33. There the accident occurred in the town of Guston which contained 150 inhabitants. Across the tracks from the depot was a ditch on the railroad company's right of way, and across the ditch a plank bridge 8 feet long and 7 feet wide had been constructed. It did not appear that the railroad company built the bridge, but there was evidence that its employees at one time repaired it. It was shown that from 25 to 75 people walked across the tracks and over the bridge each day. The plaintiff in that case crossed the bridge and was struck by a train just as she was in the act of stepping onto the track. Upon this state of facts it was held that the plaintiff was a licensee and not a trespasser. The court said:

"We are largely influenced to reach this conclusion by the fact that this place was in a small town, immediately in front of a regular passenger depot of the

company, and where the company by permitting the plank bridge to be build and remain on its right of way for the use of the public had recognized the right of the public to use its track, in fact, invited them to do so; and, having done this, it cannot say that persons so using its track at this place were trespassers.''

In the case before us there was some evidence that the use of the crossing was such as to impose upon the railroad company the duty to anticipate the presence of pedestrians at the point where Mrs. Jones was struck, and the court did not err in overruling appellant's motion for a directed verdict in its favor.

The court gave an instruction on contributory negligence, but appellant contends that the decedent was guilty of contributory negligence as a matter of law. A similar contention was made in the Lyons case, supra, but was disallowed, the court holding that where the duty of giving warning signals was imposed on the railroad company the question of contributory negligence should be left to the jury.

In instruction No. 4 the court authorized the jury to find compensatory damages for the destruction of decedent's power to earn money, and also authorized it, in addition to such damages, if any, to award punitive damages. The jury returned the following verdict:

''We the jury do agree and find for the defendant as compensation. We the jury do agree and find for the plaintiff Joe L. Jones Administrator, the sum of $2000.00 for punitive damages.''

The court erred in giving an instruction on punitive damages. Such an instruction is warranted only where there is evidence tending to show that the defendant acted maliciously, wilfully, or with such gross negligence as to indicate wanton disregard of the rights of others. C. I. T. Corporation v. Short, 273 Ky. 190, 115 S. W. 2d 899; W. T. Sistrunk & Co. v. Meisenheimer, 205 Ky. 254, 265 S. W. 467; Louisville & N. R. Co. v. Logan's Adm'x, 178 Ky. 29, 198 S. W. 537; Chesapeake & O. R. Co. v. John's Adm'x, 155 Ky. 264, 159 S. W. 822, 50 L. R. A., N. S., 853. In Louisville & N. R. Co. v. Wilkins, 143 Ky. 572, 136 S. W. 1023, 1026, Ann. Cas. 1912D, 518, the court, after citing several cases, stated the rule as follows:

534

"From these repeated adjudications the rule would. seem to be firmly established in this jurisdiction that punitive damages are recoverable only where the defendant has acted wantonly, or recklessly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations."

In Illinois Central R. Co. v. Beeler, 142 Ky. 772, 135 S. W. 305, the plaintiff was injured at a public crossing, and the negligence relied upon for recovery of damages was failure of the operators of the train to give the statutory signals for the crossing. An instruction on punitive damages was given. The plaintiff recovered a judgment against the railroad company and, in reversing the judgment and remanding the case for a new trial, this court directed the trial court to omit the instruction authorizing a recovery of punitive damages. To the same effect is Louisville & N. R. Co. v. McNary's Adm'r, 128 Ky. 408, 108 S. W. 898, 17 L. R. A., N. S., 224, 129 Am. St. Rep. 308.

The facts in the present case do not conduce to show reckless, wilful or malicious conduct on the part of those in charge of the train and therefore the instruction as to punitive damages should not have been given.

The judgment is reversed, for proceedings con sistent herewith.